[Civ. No. 10907.   Second Appellate District, Division One.—October 31, 1936.]

HACKER PIPE & SUPPLY COMPANY (a Corporation), Respondent, v. CHAPMAN VALVE MANUFACTUR- ING COMPANY (a Corporation) et al., Appellants.

266

Arthur R. Smiley, Frederick D. Anderson and Bertram L. Linz for Appellants.

Joseph N. Owen for Respondent.

SHINN, J., *pro tem.*—Plaintiff brought this action to recover damages alleged to have been suffered through breach of a contract by which plaintiff was appointed the exclusive jobber for the products of the defendant Chapman Valve Manufacturing Company (designated herein as "defend-

ant''), in the territory of southern California. The breach alleged consisted of the making of direct sales by said defendant in plaintiff's territory in alleged violation of the agreement, by reason of which plaintiff was deprived of the profits it would have made had it handled the sales as jobber. J. T. O'Leary was joined as a defendant because he assumed certain obligations as one of the contracting parties. Plaintiff had judgment in the sum of $10,676.07. This amount was arrived at by applying the percentage of profit which plaintiff had realized upon its own sales during the life of the contract to the total amount of sales made by defendant in alleged violation of the agreement, the theory of the court resting upon the assumption that plaintiff would have made the sales in the usual course of its business, and at its usual profit, had it been allowed to do so. The basis adopted by the court for computing the damages was a correct one if the assumption was justified by the evidence. It is contended by defendant that the evidence wholly failed to establish that plaintiff would or could have made the sales in question, and that therefore plaintiff failed to establish any damages consisting of the loss of profits. It is the position of defendant that if an action lies for breach of the contract plaintiff is limited in its recovery to the actual amount of profit realized by defendant from the sales involved.

It is well established that damages consisting of the loss of anticipated profits need not be established with certainty. It is sufficient that it be shown as a reasonable probability that the profits would have been earned except for the breach of the contract. As stated in *Pye* v. *Eagle Lake Lumber Co.*, 66 Cal. App. 584 [227 Pac. 193], quoting from *Kennett* v. *Katz Const. Co.*, 237 Mo. 279 [202 S. W. 558], ''While the actual amount of damages from the breach of a contract may not be susceptible of exact proof, the law does not permit one whose act has resulted in loss to another to escape liability on this account . . . the law requires only that the best evidence be adduced of which the nature of the case is capable.'' It is held generally that the breach of an exclusive sales agency contract through the invasion of the territory of the agent (which is substantially the case in hand) will entitle the latter to the profits he would have made upon sales in the amount

of those made by his principal in the invaded territory. (*Schiffman* v. *Peerless Motor Car Co.*, 13 Cal. App. 600 [110 Pac. 460]; *Bredemeier* v. *Pacific Supply Co.*, 64 Or. 576 [131 Pac. 312].) ██ In ascertaining the amount of damage it is proper to assume that one who has an established sales agency would have been able to conduct his business in the usual manner, except for the interference, and it is therefore proper to take into consideration, in estimating profits alleged to have been lost, the volume of business done in the past and the percentage of profit made thereon. (*Schumann* v. *Karrer*, 184 Cal. 50 [192 Pac. 849]; *Yaguda* v. *Motion Picture Publications, Inc.*, 140 Cal. App. 195 [35 Pac. (2d) 162]; *Erskine* v. *Marchant*, 37 Cal. App. 590 [174 Pac. 74]; *Sanford* v. *East Riverside Irr. Dist.*, 101 Cal. 275 [35 Pac. 865]; *National Oil Ref. & Mfg. Co.* v. *Producers Ref. Co.*, 169 Cal. 740 [147 Pac. 963].)

██ The contract between the parties provided in part as follows: ''The Chapman Company agree to sell their products to the Hacker Company at so-called branch house prices, which fluctuate with the valve market from time to time. These prices are established by the Chapman Company and are based on listed catalogue prices less discounts in parallel with published discounts of national valve manufacturers, namely, Crane Co. and Walworth Mfg. Co. These prices are based on F.O.B. docks, Los Angeles Harbor, expense from Los Angeles Harbor to delivery point to be assumed by the Hacker Company. The Chapman Company agrees to furnish their products on consignment to the Hacker Company to be stored at the Hacker Company Warehouse in Los Angeles at the Hacker Company expense. . . . It is understood and agreed that J. T. O'Leary, representing the Chapman Company, will control the prices given the Hacker Company and will work with them in the setting up of resale prices. On special jobs, where necessary to obtain prices from the Chapman Company home office, it is understood these prices are the ones which the Chapman Company will invoice the Hacker Company. J. T. O'Leary and the Hacker Company are to establish the resale prices to the customer in such instance. It is further understood and agreed, in cases where prospective customers express a desire, or where instances arise which

will be of mutual advantage to all concerned, that the Chapman Company, through their representative, J. T. O'Leary, have the privilege to deal direct and invoice direct, goods sold to such customers. J. T. O'Leary, in such instances, is to establish by agreement with the Hacker Company the amount of compensation to be allowed them."

Between September 15, 1931, and July 19, 1934, defendant made sales in plaintiff's exclusive territory, aggregating $68,464.17. The branch house cost of the same merchandise amounted to $67,757.04. It is obvious, therefore, that had plaintiff made the sales at the prices for which they were made by defendant, the total selling price would have exceeded the cost of the goods to plaintiff, at the branch house cost price, by the sum of $707.13. In awarding plaintiff judgment the court found that plaintiff could have sold the merchandise at a profit to itself of $10,676.07.

The defendants contend that if they breached the contract they were liable at most for the amount of their own profit on the sales and that if they made none they owed plaintiff nothing by way of damages. Further than this, they recognize no duty toward plaintiff in the matter of direct sales. But we doubt that the case is so simple. Defendants point to the fact that the sales they made were to large oil companies, municipalities and public agencies and they contend that plaintiff failed to prove that it could have made the same sales at higher prices. Cases are cited upon this point which hold that it cannot be assumed that an agent could have sold goods for higher prices than those received by his principal upon sales made in the agent's territory. But we cannot accept the rule laid down in those cases as controlling here.

There were numerous flagrant breaches of the contract by defendants. In fact, when plaintiff objected to the practice of defendants in making sales secretly the latter replied by letter as follows: "The Hacker Pipe and Supply Co. have been conversant with circumstances surrounding such sales as have been made by Chapman Valve Manufacturing Co. direct and the Chapman Company policy is that it will continue to sell direct to such customers as their representative J. T. O'Leary may elect." When it is borne in mind that defendants were fixing their own prices on the products sold without consulting plaintiff and that O'Leary

was receiving a commission on such sales as he made (which was the fact) it is apparent that defendants had no intention of respecting plaintiff's rights under the contract and considered that they could violate them with impunity. Are they to be allowed in such a case to sell at what would have been the cost of the goods to plaintiff and to say to it "there was no profit in the sales and therefore you have not been hurt"? Are they to be allowed to obliterate their contract and free themselves from their obligations by such unfair means? If such is the law an exclusive agency contract affords the agent no protection against a principal who chooses not to respect it. An agent would be at the mercy of the principal who came into the exclusive territory and sold to others at the same prices he charged his agent for like goods. The principal would have a convenient and inexpensive way of ridding himself of an undesirable contract. Of a similar situation the court said in *Schiffman* v. *Peerless Motor Car Co., supra,* "Another element entering into the consideration of such a question is that of the estoppel of defendant to deny that plaintiff would have made sale of these machines but for its violation of the contract. It does not lie in its mouth to say, you could not have sold these machines had I not devised a method whereby your employees could make these sales through another agency." It is true that it did not appear in that case whether the principal had sold for *less* than the prices the agent would have charged but that fact has no bearing upon the legal principle announced by the court. Plaintiff had an established business in selling the Chapman Company valves. It had made sales in the sum of $65,065.64, and was diligently promoting further sales. If it was impossible to know with certainty the prices at which plaintiff could have made the sales in issue the defendants and not plaintiff were responsible for the uncertainty and they should bear the responsibility. That this is a just and wholesome rule cannot be questioned. Defendants were allowed to prove the conditions under which their sales were made in an effort to show that plaintiff could not have obtained higher prices. The court found, however, that plaintiff could have made such sales and defendants do not question this finding except by their assertion that

plaintiff would have had to sell at the same prices which they received.

The fact that the goods were sold by defendants furnished sufficient proof that they could have been sold by plaintiff. In some cases they were sold at prices that would have returned a profit to plaintiff. If the damages were uncertain it was because of the difficulty in proving the amount of profit plaintiff would have made and not in proving the volume of sales that it would have made. In *Bredemeier et al.* v. *Pacific Supply Co., supra,* it was said: ''The rule that damages which are uncertain or contingent cannot be recovered does not apply to an uncertainty as to the amount of the benefit or gain to be derived from performance, but to an uncertainty or contingency as to whether any such gain or benefit would be derived at all. (Citing cases.)'' The fact that the exact amount of damage could not be determined does not defeat plaintiff's right to recover. Under section 3300 of the Civil Code, plaintiff was entitled to compensation for all the detriment proximately caused by the breach and for the detriment which in the ordinary course of things would be likely to result therefrom. The law does not require absolute certainty in fixing damages although it does require as much certainty as possible under the proof which is available. Oftentimes it is necessary that the amount be left to the discretion of the court or jury. While such, of course, is not the rule in the present case, plaintiff was entitled to recover damages as specified in said section of the code. Any uncertainty as to the amount of profit that plaintiff might have made upon the sales results solely from the arbitrary prices fixed by defendants upon the goods which they sold secretly. Defendants having taken the matter into their own hands and having refused plaintiff an opportunity to make the sales or assist in making them cannot be heard to say that the arbitrary prices which they fixed were the highest that could have been obtained. They cannot profit by their own wrong.

There is a further reason why defendants cannot be heard to complain of the method adopted by the trial court in assessing damages. The contract provided that defendant O'Leary was to agree with plaintiff upon the compensation the latter should receive on sales made directly

by defendants. The court found that it was the intention of the parties that plaintiff should receive compensation on all such direct sales. This construction of the agreement, properly drawn from its terms and the circumstances of its execution, is binding upon an appellate court. (*Scott* v. *Sun-Maid Raisin Growers Assn.*, 13 Cal. App. (2d) 353 [57 Pac. (2d) 148]; *Kautz* v. *Zurich Gen. etc. Ins. Co.*, 212 Cal. 576 [300 Pac. 34].) The compensation not being stipulated in the contract it will be presumed that the parties intended that it should be in a reasonable amount. Defendants denied plaintiff the opportunity to agree upon the amount. They sold at prices which secured their own profit without concerning themselves with plaintiff's right to compensation. The amount of plaintiff's damage was determined by the court upon the basis of plaintiff's customary percentage of profit. This was a proper basis and in fact the only fair one which the court could have adopted if the court had undertaken to determine directly what would have been a reasonable compensation to be received by plaintiff. It was the only alternative to the theory of defendants that by fixing arbitrary prices at which they would sell they thereby placed a limitation upon the damages which plaintiff could recover, namely, such profit as the defendants themselves made. When this obnoxious theory was rejected the court was required to adopt some sound basis for the measurement of the damages. It was the duty of defendants in all events to act in the highest good faith toward plaintiff. When they undertook to make direct sales upon their own responsibility they were in duty bound to sell at the highest prices obtainable. Their course of conduct lends support to the belief that they were satisfied when they had made a profit for themselves. They would have the court say to plaintiff, as they have said, ''You have no redress because you cannot prove that you could have sold the goods at a higher price if you had been given the opportunity to use your abilities in the effort.'' But it is far more just to say to defendants, ''You cannot by your own deliberate acts cast the issue of plaintiff's damage into the realm of uncertainty and thereby escape a just liability.'' To accede to the views which defendants urge upon us would be to encourage the violation of exclusive agency contracts from which principals might wish to be relieved and it

would constitute an admission of the inadequacy of the law to exact compensation for those whose rights had thus been violated. The court has found that plaintiff could have made the sales which were made by defendants, which implies that they could have been made at the prices which would have earned plaintiff its customary profit. If the best of evidence to prove this fact was not before the court plaintiff was in no way to blame. Upon the question of damages the conclusion of the trial court was just and fair and the amount awarded was not unreasonable.

Among the defenses raised by the answer of defendant Chapman Valve Manufacturing Company were those of waiver and estoppel, under which it was claimed that plaintiff waived objection to, and was estopped from complaining of, the transactions of which it now complains. Upon this appeal an elaborate argument is presented in an effort to convince this court that the findings of the trial court against the claims of estoppel and waiver are without support in the evidence.

After the contract was executed in 1931, defendant moved its stock to the warehouse and salesroom of plaintiff, where the products of defendant were prominently displayed and from which place of business deliveries were made upon sales made by defendant as well as those made by plaintiff. Defendant's agent, O'Leary, had his office there. Mr. Hacker and Mr. O'Leary discussed a few of defendant's sales but there were others in a considerable number as to which Hacker had no knowledge or information. The direct sales made by defendant were in large part secretly made and plaintiff's information concerning the same was generally no more than that which could be acquired without assistance from the representatives and employees of defendant. We think the trial court was justified in believing that Hacker, in withholding objection to defendant's sales, concerning which he had some information, depended upon O'Leary to act in good faith and in the interests of plaintiff as well as those of defendant, and that he further believed that whenever possible O'Leary would obtain prices for goods sold directly which would admit of a substantial compensation to plaintiff. This would have been the more reasonable because of the fact that O'Leary was a stockholder and secretary of plaintiff corporation and a member

of its board of directors. Plaintiff was warranted in taking the fact of this relationship into consideration in judging whether it was being honestly treated by O'Leary in the transactions which he handled directly for the defendant corporation. But the fact appears to have been that large sales were made by O'Leary without any knowledge on the part of Hacker or any other representative of plaintiff, and solely in the interests of defendant. It was not until after plaintiff learned of many sales secretly made and notified O'Leary that it would stand upon the terms of the contract and insist upon being compensated on such sales that defendant's true position was revealed. At that time O'Leary wrote the letter from which we have quoted and without offering any excuse therefor other than plaintiff's insistence that the contract be complied with, O'Leary, on behalf of defendant, gave three months' notice of termination of the agency, in accordance with a provision of the contract allowing such termination. This appears to have been the first disclosure of the attitude of defendant and O'Leary with respect to their intention to ignore the rights of plaintiff. We cannot see that consent to a few sales would be binding upon plaintiff if the consent was given in ignorance of the fact that many other sales had been made or that defendant intended to make them. It is altogether unreasonable to suppose that plaintiff would have acquiesced in a course of dealing which would have obliterated its rights as defendant's agent while defendant was using plaintiff's salesroom and facilities for the conduct of its own business.

There can be no waiver where the one against whom it is asserted has acted without full knowledge of the facts. It cannot be presumed, in the absence of such knowledge, that there was an intention to waive an existing right. (*Craig* v. *White*, 187 Cal. 489 [202 Pac. 648] ; 25 Cal. Jur. 926, 928.) The evidence was ample to justify the belief that plaintiff's sales manager did not have full knowledge of the facts.

What we have said upon the question of knowledge as bearing upon the defense of waiver is applicable as well to the pleaded defense of estoppel. There can be no estoppel where the facts are not known, as no one can

be presumed to have consented to something of which he had no knowledge. (10 Cal. Jur., sec. 17, p. 633.)

If Hacker did have knowledge of some of the sales and failed to object to them, it yet is not at all clear that his silence influenced O'Leary in any way, nor does it appear that the objection would have availed plaintiff anything. Defendant was claiming to act wholly within the terms of its contract. It contended then and contends now that it had the right to make direct sales in every case in which the same were made. It does not contend that plaintiff acquiesced in any departure from the methods prescribed by the contract. The trial court would have been fully justified in believing that the conduct of defendant was not influenced to any extent by the silence of plaintiff or its apparent acquiescence therein. The findings against the defenses of estoppel and waiver are supported by substantial evidence. It is unnecessary to decide whether Hacker had authority to waive performance of the contract by defendant.

Judgment was given against Chapman Company and also against its codefendant O'Leary. ▇ The latter contends that he was improperly joined as a party defendant and that no cause of action was alleged or proven against him. This position cannot be sustained. We have already quoted the provisions of the contract which set forth the duties of O'Leary to plaintiff. His sole obligation was to "establish by agreement with the Hacker Company the amount of compensation to be allowed them" on business done directly by the Chapman Company. The agreement was entitled: "Agreement Chapman Valve Manufacturing Company, Indian Orchard, Mass. Hacker Pipe and Supply Co., Los Angeles, and J. T. O'Leary, Los Angeles." It was signed "The Chapman Valve Manufacturing Company by Thos. F. Maher, Hacker Pipe and Supply Company by A. C. Hacker, V. P., (Signed) J. R. Dickinson, J. T. O'Leary, Representing the Chapman Valve Mfg. Co." The trial court held that O'Leary was one of the contracting parties and was therefore liable in damages for the breach of the contract. He is the one who drafted the contract by the terms of which he assumed the personal responsibility of fixing by agreement with plaintiff the amount of the latter's compensation to be paid on sales made directly by his principal, the Chapman Company. While it is true that such com-

pensation was to be paid by the latter company, the authority was vested in O'Leary to determine what that compensation should be and while this was an arbitrary authority, he bound himself by the contract to perform his duties to plaintiff in good faith. It would appear that the element of personal responsibility and duty of O'Leary as an individual, as distinguished from his actions in a representative capacity, was within the contemplation and understanding of the parties, and constituted an integral part of their agreement. It is apparent, also, that in drafting the agreement O'Leary intended to assume a personal responsibility toward the plaintiff corporation of which he was a stockholder, director and secretary. The court so understood the contract, and that construction which is clearly consistent with the terms of the writing is binding upon this court. (*Scott* v. *Sun-Maid Raisin Growers Assn., supra; Kautz* v. *Zurich Gen. A. & L. Ins. Co., supra.*) Such cause of action as plaintiff may have results directly from the breach of the obligations of O'Leary, to the performance of which he bound himself as well as defendant corporation by his contract, which, as we have noted, was executed by the defendant corporation independently of its execution by O'Leary. The rule that an agent contracting in a purely representative capacity does not assume, personally, the obligations which are imposed upon his principal does not apply. Plaintiff's cause of action against O'Leary was not for inducing a breach of the contract; it was for the breach of O'Leary's contract which constituted a breach of the Chapman Company's contract as well, and O'Leary was therefore properly joined as a defendant.

The judgment is affirmed.

Houser, P. J., and Doran, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 25, 1936.